# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LI MEN,

      Plaintiff,

v.                                    Case No. 24-CV-474-SCD

INGURAN LLC,

      Defendant.

---

## DECISION AND ORDER

Li Men worked for Inguran LLC as a lab technician for nearly six years without issue. According to Men, that all changed in early 2020, shortly after she turned 50 years old. Men claims that she was unfairly disciplined in March 2020; that her supervisor began closely scrutinizing her work and treating her less favorably than her younger colleagues; and that she was terminated in August 2022, shortly after she was unfairly disciplined (again), and she received an unjustified negative performance evaluation. Inguran claims that Men's employment with the company was terminated as part of a cost-cutting reduction in force, which resulted in the dismissal of Men and two other employees.

Unconvinced about the legitimacy of the layoff, Men filed an administrative complaint accusing her former employer of discrimination and retaliation. After that complaint was dismissed, Men sued Inguran in federal court asserting claims for age discrimination and retaliation. Men and Inguran have both moved for summary judgment on both claims. Because Men has failed to present evidence from which a reasonable jury could find that

Inguran discriminated against her because of her age or retaliated against her for complaining about discrimination, I will grant summary judgment in favor of the company.

## BACKGROUND

Ordinarily when deciding a motion for summary judgment, I would recite the facts in the light most favorable to the nonmoving party, which is usually the plaintiff in employment discrimination cases like this one. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459 (7th Cir. 2014). In this case, however, both parties have moved for summary judgment. "With cross summary judgment motions, [the court must] construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020) (quoting *United Air Lines, Inc. v. HSBC Bank USA*, 453 F.3d 463, 468 (7th Cir. 2006)).

The problem here is that each party takes issue with the other's proposed facts. For example, Inguran points out that Men did not file a separate statement of proposed facts with her summary judgment motions. *See* Pl.'s Mot. Summ. J. – Age Discrim., ECF No. 33; Pl.'s Mot. Summ. J. – Retal., ECF No. 32. Men eventually tried fixing that issue by filing a statement of proposed facts for her age-discrimination claim, ECF No. 86, and a statement of proposed facts for her retaliation claim, ECF No. 88. However, some of those proposed facts are not supported by any cited evidence, *see* Pl.'s Age Discrim. Facts ¶¶ 9–10, 41–42; Pl.'s Retal. Facts ¶¶ 6, 12, 18, 20, 36, 41, 52, 61, and, therefore, cannot be considered in deciding summary judgment. *See* Fed. R. Civ. P. 56(e). Similarly, at times Men fails to cite evidence when attempting to dispute a fact proposed by Inguran. *See* Pl.'s Resp. to Def.'s Facts ¶¶ 1–2, 4, 33–34, 37, 39–40, 54, 71, 79–80, 140, ECF No. 98. Those facts are considered undisputed for summary judgment purposes. *See* Fed. R. Civ. P. 56(e)(2).

2

Where Men does cite evidence—both to support her own facts and to dispute Inguran's—she relies almost entirely on her own declarations, *see* ECF Nos. 61–65, 69–73 & 82–83, and various exhibits produced in discovery, *see* ECF Nos. 35–36, 60-2–60-10, 60-12, 68, 77, 87, 115 & 115-1. Inguran complains that Men's declarations are riddled with unsupported and inadmissible opinion statements, not facts. It's true that some of the declarations contain speculative statements based on Men's personal belief. *See, e.g.*, Men Decl. 8, ¶ 19, ECF No. 71 ("I believe Ms. Oliveira's actions were intended to pressure me into leaving my position by steadily increasing my workload and responsibilities."). But many other statements within the declarations do appear to be based on Men's personal knowledge. Accordingly, I carefully examined the declarations to separate properly supported (or disputed) facts from impermissible conjecture.

Men, for her part, challenges Inguran's reliance on her deposition testimony. According to Men, the deposition transcript, *see* Janisch Aff., Ex. A, ECF No. 43-1, contains numerous inconsistent, incomplete, and misleading statements, which she says stem from her difficulties as a non-native English speaker (Men is Chinese), her unfamiliarity with the deposition process, and her compromised mental and physical state at the time of the deposition. To correct these alleged issues, Men filed an "errata sheet" pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, *see* ECF No. 60-8, that proposes changes to the deposition transcript, along with Men's reasoning for the alterations. Inguran has moved to strike the errata sheet. *See* Def.'s Mot. Strike, ECF No. 80. In response, Men moved to strike the entire deposition transcript or, in the alternative, to afford it minimal weight. *See* Pl.'s Mot. Strike, ECF No. 89.

As will be seen in the analysis to follow, the parties' dispute over the deposition transcript is largely immaterial. To the extent I have relied on Men's deposition testimony, it is almost always to Men's benefit. For example, I cite the transcript in support of Men's version of the June 2022 bull-check incident, *see* Background § III, and Men's allegation regarding her boss's statements, *see* Discussion § I(A).

There are only two examples of the deposition transcript potentially harmful to Men. First, Men testified that, although she never called company protocols stupid, she did say something similar:

> Q      Okay. Okay. In the next paragraph down in Exhibit 6, it says, "On Thursday, March 26, 2020, you challenged the manager saying, quote, the new protocols to prepare samples is stupid," end quote. Did I read that correctly?
>
> A      Yes.
>
> Q      Do you recall this conversation happening?
>
> A      Yes.
>
> Q      Did you say that?
>
> A      I can 100 percent sure I -- I did not say that word, s-t-u-p-i-d. Why I'm so sure, because I don't say that word. I just don't say that word.
>
> Q      Okay. Do you recall if you said anything similar to that sentence?
>
> A      Something similar, but not s-t-u-p-i-d.

Janisch Aff., Ex. A, 48:1–15. On her errata sheet, Men indicates that she didn't say the word "stupid" or even anything similar in tone or meaning. Pl.'s Errata Sheet ¶ 5. That substantive change is impermissible because it directly contradicts Men's deposition testimony and does not involve an error in transcription. *See Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) (explaining that "a change of substance which actually contradicts the

4

transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'").

Second, Men testified that she didn't know any details about who applied for a lab job during her boss's tenure as manager:

> Q    Do you have any evidence to support that Katiana discriminated against you because of your age?
>
> A    So, firstly, she never hired any people over 45 years old.
>
> Q    Do you know if people over 45 years old applied to the job?
>
> A    I don't know that[.] . . .

Janisch Aff., Ex. A, 155:21–156:3. Men does not seek to correct or clarify that portion of her deposition transcript via her errata sheet. *See* Pl.'s Errata Sheet ¶¶ 1–27. Moreover, Inguran presented that testimony as a proposed finding of fact, and Men did not dispute it. *See* Pl.'s Resp. to Def.'s Facts ¶ 134. Men therefore has no basis to object to my reliance on that testimony.

Accordingly, I will grant Inguran's motion to strike paragraph five of the errata sheet, deny Inguran's motion to strike the other proposed errata changes, and deny Men's motion to strike her deposition transcript or afford it little weight. With those preliminary issues resolved, I proceed to reciting the facts, noting any potential points of disagreement.

## I.    Men's Employment with Inguran, the First Six Years

Men was born in 1969 and was 52 years old when her employment with Inguran ended. *See* Def.'s Facts ¶ 6, ECF No. 42; Pl.'s Age Discrim. Facts ¶ 1. She started working for Inguran—a Texas company that produces and distributes sex-selected semen used for the reproduction of livestock in various agricultural industries—in May 2014, at the age of 44. Def.'s Facts ¶¶ 1–2, 7; *see* Men Decl. 1, ¶ 4, ECF No. 61. Men worked at the company's

5

Wisconsin laboratory facility, first in Shawano and later in Fond du Lac. Def.'s Facts ¶¶ 1, 8, 12. The Fond du Lac facility operated three separate labs: the CSS lab, the EU lab, and the Conventional lab. *See id.* ¶ 9; *see also* Men Decl. 1, ¶ 9; Men Decl. 3, ¶ 1, ECF No. 63 (citing Ex. 24, ECF No. 35 at 58–62). Men worked in the CSS lab, which was managed by Katiana Oliveira. Def.'s Facts ¶¶ 4, 10, 12. Oliveira is about seven years younger than Men. *See* Ex. 35, at 139, ECF No. 60-12. The EU lab was managed by Nora Ruiz. Def.'s Facts ¶ 11.

Men was a lab technician. *See* Def.'s Facts ¶ 7. As a lab tech, Men was responsible for operating and maintaining laboratory equipment, complying with the company's standard operating procedures, and following the job duties assigned by her supervisors. *Id.* ¶¶ 13–15. She reported directly to Oliveira. *Id.* ¶ 16.

Men did not have any documented SOP violations during her first six years on the job. *See* Men Decl. 2, ¶ 4, ECF No. 62.

## II. The March 2020 Tube-Handling Incident and the First Written Warning

Men received her first bad mark in March 2020. On March 10, 2020, Oliveira observed Men handling two tubes at once, in violation of company SOPs. Def.'s Facts ¶ 19; Pl.'s Resp. to Def.'s Facts ¶ 19. Men says she didn't willfully disregard the SOP; rather, the SOPs previously permitted handling two tubes at once, and she had a momentary lapse of judgment. Men Decl. 2, ¶¶ 5–8, 17. According to Men, Oliveira yelled at her, interrupted her attempts to explain herself, and unfairly labeled her response disrespectful and disruptive. Oliveira has a different take on the tube-handling incident. She says that Men interrupted *her*, raised *her* voice, and said the SOP was unimportant. Def.'s Facts ¶¶ 20–21. A few weeks later, Men told Oliveira something to the effect that the new protocols to prepare samples were stupid, although Men adamantly claims she never used that word. *See* Janisch Aff., Ex. A, 48:1–15.

6

On March 30, 2020, Oliveira issued Men a written warning for insubordination and failure to follow SOPs. Def.'s Facts ¶ 23. The warning indicated that Oliveira and Men had previously discussed Men's performance, but she still wasn't following the SOP. *See* Boles Aff., Ex. B, ECF No. 44-2. The warning further indicated that Men "behaved in a disrespectful and disruptive manner while [Oliveira] was attempting to warn [Men] regarding [her] unsatisfactory work performance" handling tubes and "used disrespectful manners towards [her] manager" when Men criticized the new protocols a few weeks after the tube-handling incident. *Id.* The warning noted that refusal to follow SOPs and failure to perform assigned tasks were serious violations of company policies and that future violations would result in disciplinary action, up to and including termination.

## III.   The June 2022 Bull-Check Incident and the Second Written Warning

Although Oliveira claims that Men continued to exhibit confrontational behavior and an unwillingness to follow instructions and SOPs, she doesn't cite any examples between March 2020 and June 2022. *See* Oliveira Aff. ¶¶ 6–8, ECF No. 45. The next specific incident occurred on June 16, 2022; Oliveira was on vacation that day, and Elise Christiansen (a shift leader) was the acting supervisor while Oliveira was out. Def.'s Facts ¶¶ 29–30. June 16 was also Men's first day back from a two-week vacation. *See* Pl.'s Age Discrim. Facts ¶ 22, (citing Men Decl. 8, ¶ 34); Janisch Aff., Ex. A, 73:2–24.

When Men tried to assume her prior role performing bull checks on June 16, Christiansen told Men that she had to work on machines instead. *See* Janisch Aff., Ex. A, 73:8–74:8; Men Decl 8, ¶ 34, Def.'s Facts ¶ 31. (The parties do not provide much detail describing these roles.) Men sought clarification about Christiansen's authority, as she was unaware at that time that Christiansen had been named acting supervisor. *See* Janisch Aff.,

Ex. A, 73:16–76:19; Men Decl. 3, ¶ 21; Def.'s Facts ¶¶ 32–33. Christiansen contacted Oliveira and, according to Men, Oliveira told Men she could perform bull checks that day. Janisch Aff., Ex. A, 74:13–76:19. After talking to Oliveira, Men returned to the bull check area, but Christiansen told Men to go to the office. *Id.* at 76:20–25. Christiansen did not tell Men why she had to go to the office; she just said, "HR letting you go," which Men believed meant she was getting fired. *See id.* 77:2–80:12.

While in the office, Christiansen and Ruiz (the EU lab manager) contacted Jalyn Boles from human resources. *See* Def.'s Facts ¶¶ 3, 34; Janisch Aff., Ex. A, 77:14–80:12. Men says she asked to communicate with Boles via email rather than over the phone or computer. Janisch Aff., Ex. A, 78:11–16. In her email to Boles, Men claimed that Oliveira told her she could continue doing bull checks that day, but Christiansen insisted that Men stop immediately. *See* Boles Aff., Ex. C, at 2, ECF No. 44-3. Boles acknowledged that, with Oliveira on vacation, "there [was] a lot of miscommunication going on." *Id.* at 1. Nevertheless, Boles told Men to follow Christiansen's instructions, explaining that Christiansen was "acting manager" in Oliveira's absence. After talking to Boles, Men agreed to work on machines and let Christiansen handle bull checks. *See* Pl.'s Resp. to Def.'s Facts ¶ 36 (citing Boles Aff., Ex. F, ECF No. 44-6).

The following day, June 17, 2022, Men replied to Boles' email and complained about how Oliveira had been treating her. *See* Def.'s Facts ¶ 39. Men wrote,

> While Katiana doesn't like me. I can't tell she has discriminated me for my race or my age or something else. When I say something with a bad accent, she makes faces to other people which I feel insulted. Sometimes she yells at me. When she yells at me, sometimes I can't help myself to yell back and then she says I am rude.

8

Boles Aff., Ex. D, at 1, ECF No. 44-4. Men also indicated that, when they discussed the shift leader position, Oliveira yelled at her and told her she had to "behave." According to Men, Oliveira told her she couldn't use a cell phone while working but then frequently called Men's cell while Men was at work. Men also said that Oliveira treated her differently than others when it came to reporting mistakes by co-workers. *See id.* at 2. Men asked if she could work somewhere else within the company like Madison or China. It's unclear whether Boles responded to Men's June 17 email, and there's no evidence Boles shared the email with Oliveira, *see* Def.'s Facts ¶ 41.

On July 8, 2022, Oliveira attempted to issue Men a second written warning for insubordination, this time related to the bull-check incident that occurred on June 16 and Men's failure to follow Christiansen's instructions. *See* Def.'s Facts ¶¶ 51, 53. The warning indicated that Men did not follow instructions and adopted her own approach toward the completion of tasks. *See* Boles Aff., Ex. F. It further indicated that Men was insubordinate toward her shift leader and her manager. Men refused to sign the second warning. Def.'s Facts ¶ 55.

Instead, a few days later, Men emailed Inguran's global production manager, Jared Templeton, claiming the warning was unfair because she didn't know Christiansen was the acting manager at the time. Def.'s Facts ¶¶ 56–58. Men also insisted that Oliveira told her she could continue performing bull checks that day and stated that she complied with Christiansen's orders after HR told her Christiansen was acting manager while Oliveira was out. *See* Boles Aff., Ex. G, at 5, ECF No. 44-7. Men told Templeton that Oliveira and Christiansen didn't respect her, and she complained about Christiansen not being disciplined for not following protocols. *See id.* at 5–6. Templeton forwarded Men's email to Boles and

9

explained that he had talked to Oliveira the day of the bull-check incident. *See id.* at 4. According to Templeton, there shouldn't have been any confusion about Christiansen's role, and Oliveira did not tell Men she could continue performing bull checks that day. Boles responded to Men's email on behalf of the company and explained that business operations can change quickly and that Men should have listened to Christiansen because she was acting manager at that time. *See id.* at 1–2. Unsatisfied with that explanation, Men asked Boles to rescind the warning because she complied as soon as she learned about Christiansen's acting managerial role. *Id.* at 1.

After two weeks passed without hearing back from Boles, Men renewed her request to remove the second written warning from her employment record. *See* Boles Aff., Ex. H, at 2–3, ECF No. 44-8. In an email to Boles, Oliveira, and Ruiz, Men again claimed that Oliveria had told her on June 16 that she could continue to perform bull checks. Boles denied Men's request to rescind the warning. *See id.* at 1–2. Boles explained that Men received the warning for not following instructions from her acting supervisor. Boles also indicated (again) that Oliveira never told Men she could continue with bull checks that day. According to Boles, Men's intentional refusal to follow Christiansen's instructions slowed down production and caused unnecessary confusion.

## IV.    Other Relevant Events from Summer 2022

Meanwhile, on July 14, 2022, Oliveira completed performance evaluations of the employees she supervised. Def.'s Facts ¶ 72 (citing Oliveira Aff., Ex. B, at 1, ECF No. 45-2). The evaluations required Oliveira to rate each employee on a scale of 1 to 5 across twelve job categories, with 1 being the lowest. *Id.* ¶ 73. Olveira gave Men mostly 1s and 2s:

| Productivity | Job knowledge | Teamwork | Attendance | Cooperation | Professional behavior |
|---|---|---|---|---|---|

| 3 | 3 | 3 | 4 | 1 | 1 |
|---|---|---|---|---|---|

| Initiative | Reliability | Ability to train others | Multitask or accomplish tasks in a timely manner | Compliance to SOPs | Accomplish LMS trainings |
|---|---|---|---|---|---|
| 2 | 2 | 2 | 3 | 1 | 2 |

Oliveira Aff., Ex. B, at 1. In the comments section of the evaluation, Oliveira noted that Men did not follow instructions, adopted her own approach toward the completion of tasks, and did not obey directives issued by her manager and shift leader.

Men had other issues at work during that summer. For example, in early-July 2022, Inguran's quality assurance department identified a contaminated semen sample that came from the CSS lab in Fond du Lac. *See* Def.'s Facts ¶ 44. A contaminated sample is bad for business. *See id.* ¶¶ 49–50. Accordingly, Oliveira investigated the contaminated sample and discovered that Men had failed to discard semen left over from a previous bull and instead left the semen inside a cooling cabinet. *See id.* ¶¶ 45–47. The investigation also revealed that Joshua Dudley, a CSS lab tech on the night shift, failed to catch the error. *See* Boles Aff., Ex. E, ECF No. 44-5. Similarly, on July 17, 2022, Christiansen told Oliveira that Men had misplaced a sample in the lab two days prior. Def.'s Facts ¶ 62. Men said she prepared all twelve samples and didn't know how one went missing, though she noted that Christiansen had been on garbage duty at the time. *See* Ex. 11, ECF No. 35 at 19–21. Christiansen's discovery of the missing sample potentially averted a contamination problem. *See* Def.'s Facts ¶¶ 64–65.

Around the same time, several of Men's co-workers complained about her attitude. One day, Maria Murillo (another shift leader) asked Men why certain lab equipment wasn't

working. *See* Oliveira Aff., Ex. C, ECF No. 45-3. Murillo told Oliveira that she wasn't able to get a clear answer because Men "gets upset very easily" and Murillo "was trying to avoid a conflict." *Id.* A few weeks later, Oliveira told Boles about an incident where Men screamed she needed help with the machines. *See* Oliveira Aff., Ex. D, ECF No. 45-4. Oliveira also indicated that Men was not polite and did not respect people, including her manager and her shift leader.

## V.    The August 2022 Reduction in Force

In mid-July 2022, management started planning for a reduction in force (RIF) at its Fond du Lac facility. *See* Boles Aff. ¶¶ 19, 23, ECF No. 44; *see also* Def.'s Facts ¶ 82. Although Inguran indicated that all lab techs at the facility were considered for termination, it appears the RIF did not include any employees from the Conventional lab. *See* Boles Aff., Ex. M, ECF No. 44-13. Management created a preliminary list of nine employees subject to the RIF, *see* Ex. 17, ECF No. 36 at 34–36,[1] and eventually narrowed the list to four, *see* Boles Aff., Ex. M. Two were from the CSS lab, Joshua Dudley (age 32) and Li Men (52), and two were from the EU lab, Benjamin Swayze (19) and Jayden Bowers (25). *See* Def.'s Facts ¶¶ 83–90. However, before the RIF was implemented, three employees who worked in the EU lab and were on the preliminary list resigned. *See* Def.'s Facts ¶¶ 100–02. Given those resignations, Inguran offered Bowers to move from the day shift to the night shift rather than be separated as part of the RIF, and he accepted. *See* Def.'s Facts ¶¶ 95–103.

---

[1] Men filed this exhibit—and eleven others—under seal, purportedly in compliance with the parties' stipulation regarding confidentiality, ECF No. 20. *See* Pl.'s Mot. to Seal, ECF No. 34. However, Inguran insists that these exhibits do not contain any personal or confidential information and are properly redacted. *See* Def.'s Resp. to Pl.'s Mot. Seal, ECF No. 50. The company also points out that several of the exhibits are already on the docket and unsealed. Because Men has failed to establish a sufficient basis for restricting access to these exhibits, I will deny her motion to seal.

The company ultimately laid off only three lab techs: Swayze (19), Dudley (32), and Men (52). *See* Def.'s Facts ¶¶ 83–95. All three employees received low performance ratings in July 2022, and all were offered separation agreements, which Swayze and Dudley accepted. Neither Swayze nor Dudley had reported discrimination or harassment prior to his termination. *Id.* ¶ 105. Men was terminated on August 25, 2022. *See id.* ¶¶ 7, 81.

After two lab technicians unexpectedly resigned in October 2022, Inguran listed an open night-shift position at its Fond du Lac facility. *See* Def.'s Facts ¶¶ 108–13. The company did not offer that position to Swayze, Dudley, or Men. *Id.* ¶ 114. Men did not apply for it, and she does not know if anyone was hired for the opening. *Id.* ¶¶ 115, 117.

## VI.    Men's EEOC Complaint

In March 2023, Men filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission. Def.'s Facts ¶ 137 (citing Janisch Aff., Ex. B, ECF No. 43-2). Men alleged that, while working at Inguran, her supervisor harassed her by constantly yelling at her, making faces behind her back, laughing at the way she spoke, threatening her with discipline, and insulting her. *See* Janisch Aff., Ex. B, at 1. She further alleged that her supervisor twice wrote her up for insubordination, that she complained to HR about her supervisor's discrimination, and that she was laid off in August 2022. Men asserted that Inguran discriminated against her due to her national origin, her race, and her age and retaliated against her for engaging in protected activity. *See id.* at 2. The EEOC investigated Men's complaint but ultimately declined to proceed further. Def.'s Facts ¶ 140.

## VII.    Men's Federal Lawsuit

In April 2024, Men sued Inguran in federal court asserting claims for age discrimination and retaliation in violation of the Age Discrimination in Employment Act of

13

1967, 29 U.S.C. §§ 621–634. *See* Compl., ECF No. 1; Compl., Attach 1, ECF No. 1-1 at 1. Men, who is proceeding without a lawyer, amended her complaint in June 2024 and added factual allegations to support her claims. *See* Am. Compl., ECF No. 3; Am. Compl., Attach. I, ECF No. 3-1 at 1–2. The body of the form complaint alleges discriminatory conduct, including termination, failure to promote, and retaliation. Am. Compl. 4. Men amended her complaint again in July 2024 but only the complaint's attached factual allegations. *See* 2d Am. Compl., Attach. I, ECF No. 15 at 1–3. That attachment references disproportionate hiring practices, a hostile work environment, promotion discrimination, and an unwelcoming environment. *Id.* at 1–2. It also references retaliation, alleging that Men complained about race and/or age discrimination in her June 17, 2022 email to HR. *Id.* at 2–3.[2]

Men and Inguran have both moved for summary judgment. On March 12, 2025, Men filed summary judgment motions regarding her age-discrimination claim, *see* ECF No. 33, and her retaliation claim, *see* ECF No. 32. Inguran filed its own summary judgment motion on March 17, 2025. *See* Def.'s Mot. Summ. J., ECF No. 41. Those three motions are fully briefed and ready for resolution. *See* ECF Nos. 46, 54, 84, 97 & 107. The parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil Procedure. *See* ECF Nos. 2 & 9.

## SUMMARY JUDGMENT STANDARD

Men and Inguran have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which

---

[2] Men subsequently clarified that she "is not pursuing separate or standalone claims for disproportionate hiring, promotion discrimination, hostile work environment, or harassment." Pl.'s Resp. to Def.'s Mot. Summ. J 16.

14

summary judgment is sought." Fed. R. Civ. P. 56(a) "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018)).

## DISCUSSION

Men asserts that Inguran discriminated against her based on her age and retaliated against her for complaining about discrimination. Both Men and Inguran seek summary judgment on each claim.

### I. Inguran Is Entitled to Summary Judgment on Men's Age-Discrimination Claim

The Age Discrimination in Employment Act "protects workers 40 years of age and older from age-based employment discrimination." *Wrolstad v. CUNA Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). As relevant here, the Act makes it unlawful for an employer "to discharge any individual [in the protected class] or otherwise discriminate against [such an] individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1)). "To prevail on an age-discrimination claim, the plaintiff must prove that [her] age was the 'but-for' cause of the challenged job action." *Wrolstad*, 911 F.3d at 454 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). "In other words, under the ADEA 'it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'" *Id.* (quoting *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)).

15

To survive summary judgment, the plaintiff must offer sufficient admissible evidence from which "a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." *Marnocha*, 986 F.3d at 719 (quoting *Carson v. Lake County*, 865 F.3d 526, 533 (7th Cir. 2017)). "A plaintiff may prove but-for causation either 'by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age' or by invoking the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Id.* at 718 (quoting *Carson*, 865 F.3d at 532–33). "Regardless of the plaintiff's chosen method(s), at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of [her] age." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 912 (7th Cir. 2025) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Men proceeds under both the direct and the indirect methods of proof.

## A.    Direct method

"Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) (citing *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008)). "Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it 'uniquely reveals' the employer's intent to discriminate." *Id.* (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005)). "More common is circumstantial evidence, which 'suggests discrimination albeit through a longer chain of inferences.'" *Id.* (quoting *Hasan*, 552 F.3d at 527). "A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue

16

on whether discrimination motivated the employment action." *Id.* The Seventh Circuit has identified three general categories of circumstantial evidence: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (citing *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)).

Men points to two comments that she believes constitute direct evidence of age-based discrimination. First, according to Men, Oliveira repeatedly told her to "look for another job." Second, on another occasion, Oliveira told Men that she needed to "behave." Men says that she did not observe Oliveira making similar remarks to younger employees.

Men presents no evidence suggesting that Oliveira's comments were related to her age. Both comments are facially age-neutral. Moreover, the context in which they were made does not support an inference of discriminatory intent. *See Skiba*, 884 F.3d at 720–21 (finding age-neutral statements "innocuous when viewed in context"). Men testified during her deposition that each time Oliveira told her to look for another job was after she had complained about being tired, needing help, or wanting a day off work. *See* Janisch Aff., Ex. A, 88:4–92:25, 156:1–157:18. Suggesting that someone look for another job after they complain about work is not evidence of age discrimination. Oliveira did not, for example, imply that Men was tired or couldn't keep up because she was old. In fact, Men's complaints appear to be common refrains from overwhelmed workers of all ages. *See, e.g.*, *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 672 (7th Cir. 1998) ("To evaluate an individual worker or a group of workers as lacking energy, initiative, commitment, imagination, flexibility, or other desired characteristics is not

17

to indulge in age stereotypes, and is indeed the kind of evaluative approach that the antidiscrimination laws seek to encourage.").

Similarly, there's no evidence that the "behave" comment had anything to do with Men's age. Men says that, after she told Oliveira that she should be given a leadership title if she was expected to lead other employees, Oliveira responded by yelling at her to "behave" and shouting, "You make more money, and you need to be responsible for the shift." Men Decl. 8, ¶ 17; *see also* Janisch Aff., Ex. A, 102:22–104:14. Again, there's no evidence linking those statements to Men's age. Oliveira did not, for example, imply that Men needed to behave because she was the oldest and, perhaps, most mature worker in the lab. Rather, as Men tells it, Oliveira explicitly indicated that Men was expected to be responsible for leading the shift because she made more money. That's not evidence of discriminatory intent.

Men also attempts to present circumstantial evidence of age discrimination. She notes that, during her time as manager, Oliveira hired about thirty new employees into the CSS lab, and none were over the age of 45. *See* Pl.'s Age Discrimination Facts ¶¶ 26, 43; *see also* Men Decl. 8, ¶¶ 13, 24, 31, 45, 47–51. Men also notes that, in the CSS lab—which had about twenty employees—she was the only one over 40, and the average age was 28. In contrast, according to Men, at least five of the thirty-five employees in the EU lab were over 45, and at least two of the six employees in the Conventional lab were over 50. Men insists that this age composition data supports a strong inference of age discrimination within the CSS lab.

Although in some cases statistical disparities in hiring can support an inference of age discrimination, *see Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 337–340 (1977), the rudimentary statistics Men presents are insufficient to create a triable issue of fact in this case. Men attempts to show a bias against older workers in the CSS lab based on Oliveira's allegedly

18

discriminatory hiring practices. But Men's age-discrimination claim centers on her termination; she does not have a failure-to-hire claim. *See* Pl.'s Resp. to Def.'s Mot. Summ. J. 3 (Men explaining that she asserts only two causes of action: retaliation and "discriminatory termination based on age, in violation of the ADEA"). Thus, Oliveira's hiring history is of questionable relevance to the claim Men is pursuing.

Even if the age composition of the labs were relevant to Men's age-discrimination claim, her statistics still would fall short of creating an inference of discrimination. The small number of employees in each lab "makes statistical evidence of no value in proving an employment discrimination claim." *Woodson v. Pfizer, Inc.*, 34 F. App'x 490, 493 (7th Cir. 2002) (citing *Morgan v. Harris Trust & Sav. Bank*, 867 F.2d 1023, 1028 (7th Cir. 1989)). Furthermore, Men admits that she has no idea whether a qualified individual over 45 ever even *applied* for a lab tech position with the CSS lab during Oliveira's tenure as manager. *See* Janisch Aff., Ex. A, 155:21–156:3. Without evidence about who was applying for those positions, Men's statistics have no probative value. *See EEOC v. Chi. Miniature Lamp Works*, 947 F.2d 292, 301–02 (7th Cir. 1991) (noting that the applicant pool is key in analyzing statistics presented in discriminatory hiring cases); *see also EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 886 (7th Cir. 1994) ("[T]he statistical model on which the district court relied was fatally flawed because the relevant labor market used by the EEOC failed to identify qualified and interested applicants."); *Woods v. Von Maur, Inc.*, 837 F. Supp. 2d 857, 863–64 (N.D. Ill. 2011) (rejecting a plaintiff's "inexorable zero" argument because she failed to present any evidence of how many qualified individuals in the protected class applied for the position in question).

## B. Indirect method

The indirect, burden-shifting method involves (potentially) three steps. The plaintiff must first offer evidence showing that: "(1) [she] was over forty years of age; (2) [she] was meeting [her] employer's legitimate expectations; (3) [she] suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably." *Murphy*, 140 F.4th at 911 (quoting *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771–72 (7th Cir. 2002)). "If the plaintiff has established this prima facie case, the burden shifts 'to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)). If the defendant provides a legitimate, nondiscriminatory reason, "the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Ibid.*

The parties agree that Men, at age 52, was a member of the class protected by the ADEA and that Men's termination was an adverse employment action. However, Inguran insists that the other conduct Men complains about does not constitute an adverse employment action. The parties also disagree on whether Men was meeting Inguran's legitimate expectations and whether the company treated similarly situated, younger employees more favorably than Men. Moreover, Inguran maintains that, even if Men could establish a prima facie case of age discrimination, the company had a legitimate, nondiscriminatory reason for terminating her employment: the August 2022 reduction in force. Men, however, contends that Inguran's stated reason was pretextual.

### 1. Adverse employment actions

According to Men, she suffered three adverse employment actions: (1) the July 2022 second written warning; (2) the July 2022 performance evaluation; and (3) the August 2022 termination. The Seventh Circuit has held that these first two actions—a written reprimand

and a negative performance evaluation—do not constitute adverse employment actions on their own. *See Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996); *Silk v. City of Chicago*, 194 F.3d 788, 801–03 (7th Cir. 1999); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998)). Rather, to satisfy the adverse action requirement, reprimands and negative performance evaluations must be accompanied by "tangible job consequences." *See id.*

Men has not pointed to any immediate, tangible consequence of the second written warning or the negative performance evaluation. Instead, she presents those actions as predicates to justifying her termination, which clearly is a materially adverse action. *See Oest*, 240 F.3d at 613–14; *see also Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 800 (7th Cir. 2014). Thus, while the written warning and negative evaluation may not constitute independent adverse actions, they remain (potentially) relevant evidence in support of Men's age-discrimination claim.

### 2. Inguran's justifications and Men's comparators

Men insists that, prior to her termination, she was meeting Inguran's legitimate expectations. As support, she notes that she worked at the company for nearly six years without any disciplinary issues. Men acknowledges that she received a first written warning in March 2020 for insubordination and failure to follow SOPs. However, she points out that there's no evidence of any other violations until June 2022. Men says that, during that time, she regularly trained and supported new employees. Men also points out that, in March 2022, she received a performance rating of 2 on a scale of 1 to 3, which she believes indicates she was meeting the company's expectations.

21

Inguran maintains that the undisputed facts show that Men was not meeting the company's legitimate expectations at the time of her termination. According to Inguran, Men repeatedly challenged her supervisors and refused to follow standard lab processes, at one point calling them "stupid" (or words to that effect). Men also received two written warnings for insubordination and failure to follow SOPs (in March 2020 and July 2022). Inguran says that Men's failure to follow procedures also resulted in a contaminated semen sample and a lost sample. The company also notes that Men's co-workers repeatedly complained to HR about her argumentative and disrespectful conduct and that Men received low ratings on her July 2022 performance evaluation. Inguran argues that Men's unsatisfactory performance was the basis for its legal, nondiscriminatory decision to terminate Men's employment, along with three other low-performing (and younger) lab tech workers, during the August 2022 reduction in force.

In response to Inguran's arguments about the company's justifications for terminating her employment, Men identifies five younger employees that she says were treated more favorably than she was. *See* Pl.'s Resp. to Def.'s Mot. Summ. J. 7–8. Inguran asserts that Men's chosen comparators were not similarly situated because they did not engage in similar misconduct. In other words, according to Inguran, Men's comparators were meeting the company's legitimate job expectations, but Men was not. The question of whether Men was meeting Inguran's legitimate expectations therefore merges with the question of whether the company's reasons for taking adverse employment action against Men were pretextual. "In such cases where the issue of meeting legitimate job expectations and the question of pretext overlap, [courts] may skip a sequential *McDonnell Douglas* analysis and turn directly to pretext." *Murphy*, 140 F.4th at 914 (citing *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022)).

22

### 3.    Pretext

To show that Inguran's stated reason for terminating her employment is pretextual, Men "must present evidence suggesting that the employer is dissembling." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Ibid.* "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* (quoting *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010)). To satisfy this burden, Men "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Murphy*, 140 F.4th at 914 (quoting *Marnocha*, 986 F.3d at 721).

Men argues that Inguran's proffered justifications are dubious for multiple reasons, none of which are persuasive. *First*, she says Inguran's selection of supposedly low-performing employees contradicts the company's own policy about reductions in force. The employee handbook defines a "layoff" as an "involuntary employment termination initiated by the Company for non-disciplinary reasons." *See* Ex. 35, at 24. Men reads this language to mean that a layoff cannot be based on performance or misconduct. But that's not what the handbook says. Rather, the purpose of the handbook's definition is to differentiate between a termination and a layoff. That definition, however, does not limit the factors the company may consider when implementing a RIF.

23

*Second*, Men accuses Inguran of providing shifting explanations regarding the number of employees selected for the RIF. The separation agreement offered to Men indicated that four employees—ages 19, 25, 32, and 52—had been selected for the layoff. *See* Boles Aff., Ex. M. Inguran's EEOC position statement stated that "approximately nine" employees from the CSS lab had been laid off. *See* Ex. 4, ECF No. 36 at 5–16. And during the discovery process in this case, Inguran told Men that it had been only three employees, ages 19, 32, and 52. *See* Ex. 34, at 5, ECF No. 60-3.

Inguran has a good explanation for these discrepancies. According to Inguran, the position statement was based on the preliminary list of employees subject to the RIF, *see* Ex. 17, not those ultimately selected. After three employees from that list resigned in July 2022, the company offered Bowers (the 25-year-old listed on the separation agreement) to move from the day shift to the night shift rather than be separated as part of the RIF, and he accepted. *See* Def.'s Facts ¶¶ 95–103. So in the end only three employees were terminated: Swayze (age 19), Dudley (32), and Men (52). *See id.* ¶¶ 83–90. Men does not offer any evidence to contradict the company's explanation. Nor does she explain why the precise number of employees selected is crucial to the overall legitimacy of the RIF.

*Third*, Men asserts that Inguran's performance-based rationale doesn't pass the sniff test because the company did not select for termination the lowest-rated employee in the CSS lab: Leeroy Olivares. Olivares is about thirty-three years younger than Men and was a lab tech managed by Oliveira. *See* Ex. 17. He received by far the lowest total score during the July 2022 performance evaluations, 19, which included a 1 or a 2 in each category. *See* Oliveira Aff.,

24

Ex. B, at 3.[3] In the notes section of the evaluation, Oliveira indicated that Olivares needed to be told many times to do tasks, refused to help co-workers with issues despite his experience, was unable to focus on more than one task at a time, and had issues with attendance. Despite those performance issues, Olivares was not selected for the RIF. Instead, he was placed on a PIP (performance improvement plan). *See* Ex. 5, ECF No. 36 at 17–19. The improvement plan noted several SOP violations. It also said that Olivares would be disciplined if he continued to ignore tasks assigned by his supervisor. However, according to Men, Olivares was not disciplined for his behavior, which she characterizes as insubordination.[4]

The fact that Olivares wasn't laid off doesn't suggest that the RIF was an elaborate coverup for unlawful age discrimination against Men. Although Inguran insists that all three employees selected for the layoff received low performance ratings in July 2022, nothing compelled the company to select the lowest (or lowest three) performers. There are many other, non-discriminatory factors employers may consider when choosing which employees to let go (e.g., salary, attitude, cultural fit), and courts should not question those judgments. *See Murphy*, 140 F.4th at 915 ("We have said repeatedly . . . that the court is not a 'super personnel department that second-guesses employers' business judgments.'") (quoting *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016)). And while Olivares may have ignored tasks assigned by his supervisor, unlike Men, there's no evidence he was disrespectful toward management.

The same is true regarding Men's other proposed comparators: Elise Christiansen, Maria Murillo, Joshua Dudley, and Nyaira Barrett. Those employees dealt with the same

---

[3] Men had the second-lowest score, 27, but she received a 4 in one category and a 3 in several others. *See* Oliveira Aff., Ex. B, at 1.

[4] Olivares unexpectedly resigned from his lab tech position in October 2022. *See* Def.'s Facts ¶¶ 109, 111.

25

supervisor as Men and were subject to the same standards. However, Men has not shown that they engaged in conduct "of *comparable seriousness*." *Coleman*, 667 F.3d at 850 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). Men says Christiansen, Murillo, Dudley, and Barrett violated SOPs and had attendance issues. But Men wasn't cited for attendance problems or simply not following rules. Her main issues were pushing back on management and failing to accept responsibility for her performance issues. There's no evidence those other four employees engaged in that type of misconduct.

*Fourth*, Men questions the reliability of the July 2022 performance evaluation, arguing that it was not shared with her during her employment, it lacks objective support, and it was retaliatory. It appears Oliveira completed those evaluations during the planning phase of the RIF, which suggests they were not meant to be shared with employees during a formal review. *See* Def.'s Facts ¶ 99 (noting that planning for the RIF began in mid-July); Oliveira Aff., Ex. B (noting that the evaluations were completed on July 14, 2022). At the time, Oliveira was not aware of whether Men had made any complaints about discrimination or harassment, *see* Def.'s Facts ¶ 147, so her negative evaluation couldn't have been retaliatory. *See Kuhn v. United Airlines, Inc.*, 640 F. App'x 534, 539 (7th Cir. 2016) (granting summary judgment in favor of a defendant on a plaintiff's retaliation claim because the plaintiff "presented no evidence that any of the relevant supervisors were aware of her charge [of discrimination] at any time during their allegedly inadequate investigations").

The fact that Inguran hasn't provided objective support for each rating within the July performance evaluation doesn't call into question the authenticity of the entire evaluation process. Employers cannot be expected to create a paper trail for every employee shortcoming. Moreover, the record does contain at least some support for Men's ratings. Men admits she

26

violated SOPs when handling test tubes in March 2020. *See* Pl.'s Resp. to Def.'s Mot. Summ. J. 8 ("Plaintiff acknowledges that she committed a single SOP violation in March 2020."). Although Men disputes raising her voice at Oliveira during that incident and insists she didn't call the SOPs "stupid," she admitted during her deposition that she said "something similar." *See* Janisch Aff., Ex. A, 48:1–15. Not following and questioning procedures is a serious problem in any workplace, and especially in lab environment like Inguran's.

*Finally*, Men says that the RIF is suspect because shortly thereafter Inguran rehired for a substantially similar position. It's true that in October 2022—less than two months after Men and two others were laid off—the company listed an open night-shift position at its Fond du Lac facility. *See* Def.'s Facts ¶ 113. But again, Inguran has a good explanation for that apparent contradiction. After the company layoff, two lab technicians unexpectedly resigned. *See id.* ¶¶ 108–12. Inguran did not reach out to any of the three laid off employees about the opening, and Men didn't apply. *Id.* ¶¶ 114–15. Men also doesn't know if anyone was hired based on that job posting. *Id.* ¶ 117. Consequently, the post-RIF job posting doesn't reveal anything about Inguran's motives in letting Men go. *See, e.g.*, *Nesbit v. Pepsico, Inc.*, 994 F.2nd 703, 705 (9th Cir. 1993) ("The subsequent hiring of younger persons to fill other openings created by attrition is immaterial to [the defendant's] intent with respect to these plaintiffs.").

*       *       *

Considering the evidence as a whole—as I must—I find that no reasonable factfinder could conclude that age constituted the but-for cause of Men's termination and allegedly unfair treatment. The undisputed facts show that Inguran terminated Men's employment as part of a reduction in force, and Men has not presented sufficient evidence suggesting that reason was a lie. Men *has* presented evidence suggesting that her boss didn't like her and that

27

she may have been trying to find a way to get rid of her. While perhaps unfair, such personality conflicts are not actionable under federal anti-discrimination laws. *See, e.g.*, *Brown v. Advoc. S. Suburban Hosp. & Advoc. Health & Hosps. Corp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) (holding that "'[p]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable' under Title VII") (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Selsor v. Callaghan & Co.*, 609 F. Supp. 1003, 1008 (N.D. Ill. 1985) ("A personality conflict with a supervisor may be a legitimate reason for discharge, if the conflict is not at all related to the plaintiff's age."). Because Men has failed to produce sufficient admissible evidence from which a reasonable jury could find that she suffered an adverse job action because of her age, Inguran is entitled to summary judgment on Men's age-discrimination claim.

## II.    Inguran Is Entitled to Summary Judgment on Men's Retaliation Claim

The Age Discrimination in Employment Act "also prohibits retaliation for activity protected by the Act." *Wrolstad*, 911 F.3d at 456. "More specifically, the Act makes it unlawful for an employer to 'discriminate against any of [its] employees . . . [for] oppos[ing] any practice made unlawful by this section' or because the employee . . . 'has made a charge . . . under this chapter.'" *Id.* (quoting 29 U.S.C. § 623(d)).[5]

"Like discrimination, retaliation may be established by either the direct or indirect methods of proof." *Coleman*, 667 F.3d at 859 (citing *Weber v. Univs. Rsch. Ass'n*, 621 F.3d 589, 592 (7th Cir. 2010)). Men appears to proceed under the direct method of proof. *See* Pl.'s Reply

---

[5] In her summary judgment materials, Men alleges retaliation under both the ADEA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17. *See* Pl.'s Mot. Summ. J. – Retal. 1; Pl.'s Resp. to Def.'s Mot. Summ. J. 2–4, 12–13, 16–17. However, Men did not allege a Title VII claim in any of her complaints or attachments thereto. *See* Compl. 3; Compl., Attach. 1; Am. Compl. 3; Am. Compl., Attach. I; 2d Am. Compl., Attach. I. No matter. The standard is the same under both the ADEA and Title VII. *See, e.g.*, *Mollet v. City of Greenfield*, 926 F.3d 894, 896–98 (7th Cir. 2019).

28

in Supp. Mot. Summ. J. 6; Pl.'s Resp. to Def.'s Mot. Summ. J. 12. To survive summary judgment under the direct method, Men "must offer evidence of: '(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Skiba*, 884 F.3d at 718 (quoting *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017)). "This causal link may be established through either direct or circumstantial evidence from which a jury may infer intentional retaliation." *Murphy*, 140 F.3d at 918 (citing *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)). "Under the ADEA[,] retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455–56 (7th Cir. 2011) (citing *Gross*, 557 U.S. at 177–78; *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010)).

Inguran concedes that Men's termination constitutes an adverse employment action. However, the parties dispute whether Men engaged in statutorily protected activity and, if so, whether there's a causal connection between that activity and Men's termination.

### A.     Statutorily protected activity

"Statutorily-protected activity 'requires more than simply a complaint about some situation at work, no matter how valid the complaint might be.'" *Skiba*, 884 F.3d at 718 (quoting *Cole v. Bd. of Trs.*, 838 F.3d 888, 901 (7th Cir. 2016)). "Rather, 'the complaint must indicate [that] discrimination occurred because of sex, race, national origin, or some other protected class.'" *Id.* (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Ibid.*

29

Men insists that her email to HR on June 17, 2022, constituted statutorily protected activity. In that email Men wrote,

> While Katiana doesn't like me. I can't tell she has discriminated me for my race or my age or something else. When I say something with a bad accent, she makes faces to other people which I feel insulted. Sometimes she yells at me. When she yells at me, sometimes I can't help myself to yell back and then she says I am rude.

Boles Aff., Ex. D, at 1. Men went on to describe specific examples of allegedly unfair treatment at the hands of Oliveira. *See id.* at 1–2.

Inguran contends that Men's email is insufficient because it was equivocal and because Men merely described a personality conflict between her and her boss. As support, Inguran relies on two cases, *Skiba* and *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655 (7th Cir. 2012), but both are distinguishable from our case. The complaints at issue in *Skiba* and *Smith* did not reference any protected class at all, either directly or indirectly. *See Skiba*, 884 F.3d at 718–19; *Smith*, 674 F.3d at 658. In contrast, here Men explicitly referenced both her race and her age as potential bases for why Oliveira might be mistreating her. She also said that Oliveira made faces to others when Men spoke with a bad accent. Although Men wasn't 100% sure why Oliveira was upset with her, she did suggest that Oliveira acted with unlawful discriminatory animus. That's arguably enough to satisfy the first prong of a prima facie case of retaliation under the direct method of proof. *See Sitar v. Ind. Dep't of Trans.*, 344 F.3d 720, 727 (7th Cir. 2003) ("Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue.'") (quoting *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007–08 (7th Cir. 2000)).

### B. Causal connection

"To determine whether a genuine issue of material fact exists as to causation in a retaliation claim, [the court] must consider the complete record and assess whether a reasonable jury could infer retaliatory intent." *Murphy*, 140 F.4th at 918 (citing *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017)). "A plaintiff may establish this causal connection through circumstantial evidence, including but not limited to 'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Id.* (quoting *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023)). "Each of these categories, standing alone, may be sufficient to preclude summary judgment." *Id.* (citing *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015)).

Men's retaliation claim fails largely for the same reasons her discrimination claim failed. She does not offer any evidence of statements that would support an inference of retaliatory motive. The comparators she presents did not engage in comparable misconduct. And as explained in detail above, she has not shown that Inguran's proffered reason for her termination—the reduction in force—was a lie.

Without that evidence, Men's retaliation claim hinges entirely on allegedly suspicious timing. "[T]emporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Coleman*, 667 F.3d at 860 (quoting *O'Leary*, 657 F.3d at 635). "When temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, however, '[s]uspicious timing . . . can sometimes raise an inference of a causal connection.'" *Id.* at 860–61 (quoting *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008)). There is no "bright-line numeric rule." *Id.* at 861. However, "when there is corroborating evidence of retaliatory

31

motive, . . . an interval of a few weeks or even months may provide probative evidence of the required causal nexus." *Id.* (citing *Magyar*, 544 F.3d at 772).

This case is not one of the rare cases where suspicious timing, standing alone, is sufficient to raise an inference of retaliation. Men mentioned potential race or age discrimination in her email to HR on June 17. Although she received her second written warning just three weeks later, that warning was based on conduct that happened on June 16—the day before the HR email—and there is no evidence that Oliveira knew about the email or did not intend to issue the warning until after Men sent it. *See Miller*, 203 F.3d at 1008 ("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints."). Likewise, there is no evidence that Oliveira was aware of Men's email to HR when she completed the performance evaluations on July 14. By that time, Inguran had already started planning for the reduction of force, which resulted in Men's termination on August 25, as well as the termination of two other, low-performing employees. Inguran did not have to base its layoff decision solely on performance, and it is undisputed that Men—at the very least—violated and criticized company rules in March 2020. Finally, Men's email was so equivocal that even Men did not seem to know if she was being discriminated against for a prohibited reason. Thus, it's difficult to conclude the employer would have seized on Men's vague email as a basis for retaliation.

\*     \*     \*

Considering the evidence as a whole, I find that no reasonable factfinder could conclude that Men's complaints about allegedly discriminatory treatment were the but-for cause of her second written warning, her negative performance evaluation, or her

termination. Men arguably engaged in statutorily protected activity in June 2022 when she reported potential race or age discrimination at the hands of Oliveira to HR. However, Men has not presented enough evidence to support a causal link between that activity and an adverse employment action. Because Men has failed to produce sufficient admissible evidence from which a reasonable jury could find that she was retaliated against for engaging in activity protected by the ADEA, Inguran is entitled to summary judgment on Men's retaliation claim.

## CONCLUSION

Men has failed to present evidence from which a reasonable jury could find that Inguran discriminated against her because of her age or retaliated against her for complaining about discrimination. Accordingly, for all the foregoing reasons, the court **DENIES** the plaintiff's motion for summary judgment on liability for age discrimination, ECF No. 33; **DENIES** the plaintiff's motion for summary judgment on liability for retaliation, ECF No. 32; and **GRANTS** the defendant's motion for summary judgment, ECF No. 41. The court also **DENIES** the plaintiff's motion to file 12 exhibits under seal, ECF No. 34; **GRANTS in part and DENIES in part** the defendant's motion to strike plaintiff's proposed errata changes, ECF No. 80; and **DENIES** the plaintiff's motion to strike her deposition testimony or, in the alternative, to afford in minimal weight, ECF No. 89. The clerk of court shall enter judgment that this action is dismissed and that Men shall take nothing from the defendant by her amended complaint.

**SO ORDERED** this 4th day of September, 2025.

33

STEPHEN C. DRIES
United States Magistrate Judge